S. LANE TUCKER
United States Attorney

AINSLEY MCNERNEY
Assistant U.S. Attorney
ANDREA W. HATTAN
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: Ainsley.McNerney1@usdoj.gov
Email: Andrea.Hattan@noaa.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>      vs.<br><br>DUGAN PAUL DANIELS,<br><br>                    Defendant. | No. 1:24-cr-00006-TMB-MMS |

**SENTENCING MEMORANDUM**

The United States recommends the Court impose the following sentence in this case:

**INCARCERATION**.................................................................................**6 MONTHS**
**SUPERVISED RELEASE** .......................................................................**3 YEARS**
**SPECIAL ASSESSMENT**.................................................................................**$125**
**RESTITUTION** ............................................................................................... **N/A**
**FINE**.............................................................................................................. **$25,000**

**FACTS**

Defendant Dugan Paul Daniels is a longtime Southeast Alaska commercial fisherman and vessel captain. After an investigation by the National Oceanic and Atmospheric Administration (NOAA) Office of Law Enforcement, Daniels admitted he committed two crimes directly related to that work: (1) violating the Endangered Species Act by taking an endangered sperm whale; and (2) violating the Lacey Act by making and submitting falsified fishing records. (Doc. 3.)

## I. Endangered Species Act – sperm whale illegal take

Sperm whales (*Physeter macrocephalus*) are listed as an endangered species of wildlife under the Endangered Species Act. 16 U.S.C. § 1533; 50 C.F.R. § 17.11(h). They are found in every ocean on Earth, including the North Pacific, and are the world's largest toothed whale and among the deepest diving cetaceans (whales, dolphins, porpoises).[1] They regularly hunt for food at depths of nearly 2,000 feet and use echolocational signals to forage and navigate. Males average 52 feet in length, while females average 40 feet in length.

Commercial whaling decimated the sperm whale population between approximately 1800 and 1986.[2] Among other things, commercial whalers targeted sperm whales for the



---

[1] https://www.fisheries.noaa.gov/species/sperm-whale.
[2] *Id.*; https://seaswap.info/sperm-whales/.

Case 1:24-cr-00006-TMB-MMS    Document 24    Filed 11/05/24    Page 2 of 22

waxy substance (spermaceti) found in their heads, which was used in oil lamps, lubricants, and candles. Today, two of the primary threats to sperm whales are vessel strikes and fishing gear entanglement.[3] Relatedly, sperm whales are known to engage in a behavior known as depredation in which they remove fish from longline fishing gear.[4] This involves whales shaking fish from fishing hooks by using their toothed jaw or running their lower teeth over the hooks, popping fish off as they go. Depredation increases whales' risk of being struck by a vessel and becoming entangled in fishing gear. It also costs fishermen in catch, gear, and time.

In March 2020, Daniels, captaining his vessel, the fishing vessel (F/V) *Pacific Bounty*, tried to kill at least one sperm whale. Specifically, on March 25 and March 26, 2020, Daniels and three crewmembers were longline fishing for sablefish approximately 31 nautical miles southwest of Yakobi Island in the Gulf of Alaska when they encountered a whale. In his International Pacific Halibut Commission logbook Daniels wrote this about the three sets of fishing gear affected: "Set 3 & 4 whale killed us. Cost me $4800 in gear. The whales need a population reduction. Set 5 whale broke our line." Daniels also documented the whale encounters in text messages he sent to five people from his global positioning system (GPS) communication device. He said his crew shot a sperm whale six times. He said he tried to ram the whale, and came within five to ten feet of doing so. He said the whale was entangled in his fishing gear and he hoped to reel the

---

[3] https://www.fisheries.noaa.gov/species/sperm-whale.
[4] https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-longlines.
U.S. v. Daniels
1:24-cr-00006-TMB-MMS

whale in dead.

For instance, Daniels described two encounters with whales to Person A, one on March 25 in which Daniels "was five feet from ramming" it and a second involving a "sperm whale" on March 26:

| Date/time | Sender | Messages with Person A |
|---|---|---|
| 3/25/2020 - 7:21pm | Daniels | A whale is here but because there was no anchor he could get on the gear |
| 3/25/2020 - 7:21pm | Daniels | I was five feet from ramming him just now |
| 3/26/2020 - 12:31am | Daniels | F*** me we got a whale f*** f*** f*** |
| 3/26/2020 - 4:54am | Daniels | We just had the whale on!!! He got tangled in our gear after we got anchor off and then the line took off and I could drive on it fast enough to keep up and it |
| 3/26/2020 - 4:55am | Daniels | Exploded. Going to other end now to see how much we can get back I hope he dies from being entangled. That was f***ing crazy |
| 3/26/2020 - 6:00am | Daniels | Nice we got other end up and hope to be reeling in a dead sperm whale |

In messages to Person B on March 26, Daniels said he "almost rammed" the whale and "wish[ed] [he] had a cannon to blow the f***** out of the water." He said he "did not care" that killing the whale was a federal offense:

| Date/time | Sender | Messages with Person B |
|---|---|---|
| 3/26/2020 - 12:46pm | Daniels | F*** f*** f*** we got a whale I would rather be a** rapped [*sic*] right now then have this happening he has killed us today hauled two sets and got only 50 fish |
| 3/26/2020 - 1:11am | Daniels | I almost rammed it missed by ten feet but he came back wish I had a cannon to blow the f***** out of the water |
| 3/26/2020 - 1:16am | Person B | Um yeah don't kill a whale. That's a federal offense |
| 3/26/2020 - 1:17am | Daniels | The feds are shut down and I don't care |
| 3/26/2020 – 5:59am | Daniels | . . .we had the whale on he got tangled in our gear . . . |

Similarly, in a series of messages to Person C, Daniels again recounted two whale

interactions during which Daniels tried to ram the whale, a crewman put "6 rounds in it," and Daniels continued to reel in the fishing line even after the entangled "sperm whale" took off:

| Date/time | Sender | Messages with Person C |
|---|---|---|
| 3/25/2020 - 7:29pm | Daniels | Peaks and valleys get them one set not so much the next hauled up s*** loads of derelict gear and an anchor. Parted off first set this morning but turned into |
| 3/25/2020 - 7:30pm | Daniels | A blessing as a whale showed up and could get on the gear because the anchor was missing. I was ten feet from ramming him just now. Gonna set and hope the rest |
| 3/26/2020 - 12:32am | Daniels | F*** me we have a whale [crewman] has put 6 rounds in it and it keeps coming back |
| 3/26/2020 - 1:17am | Daniels | Things are never easy for me it's hard to keep trying sometimes but this f***** will say my name before I am done with him |
| 3/26/2020 - 4:57am | Daniels | Your [sic] not gonna believe this [crewman] just got anchor on boat. Started hauling with gear straight up and down and then it took off I went back and drive on it |
| 3/26/2020 - 4:58am | Daniels | Wide open throttle and couldn't keep up! It finally got exploded going to other end now to reel in our first sperm whale and finish him off |

Daniels also texted Person D on March 26 at 4:56 a.m.: "The whale just got tangled in our gear . . . and took off . . . and [the line] exploded." At 6:12 a.m., Daniels wrote Person D that the whale "has 1/2" blue steel line wrapped up on him" and "we will know in one [m]ile of hauling w[hether] we still got him or not."

NOAA does not know if Daniels succeeded in killing the whale. No sperm whale carcass was reported in Southeast Alaska in 2020. Regardless, as Daniels admitted, his conduct constituted an unlawful take in violation of the Endangered Species Act. (Doc. 3.)

## II. Lacey Act – false labeling

On two fishing trips at the end of the fishing season in 2020, Daniels made a series of false statements in the F/V *Pacific Bounty*'s daily fishing logbook, on IFQ landing reports, and on Alaska Department of Fish & Game fish tickets. He did so to cover up his illegal harvest of sablefish (also known as black cod) in state waters. Background information regarding the fisheries at issue and a synopsis of Daniels' Lacey Act offense conduct follows.

### A. Sablefish and Halibut Fisheries in Southeast Alaska

The State of Alaska has two separate limited entry sablefish fisheries in the inside waters of Southeast Alaska: (1) the Southern Southeast Inside Subdistrict (SSEI) fishery,

 which includes Clarence Strait; and (2) the Northern Southeast Inside Subdistrict (NSEI) fishery, which includes Chatham Strait. The SSEI and NSEI sablefish fisheries require separate state permits, which are hard to come by and, when they do become available, are expensive. In 2020, the permits were worth hundreds of thousands of dollars apiece.

NOAA's National Marine Fisheries Service (NMFS) limits commercial fishing for sablefish and halibut in Alaska to persons with quota share. *Seabeck*, No. AK1402606, 2017 WL 10845066, at *3 (N.O.A.A. Dec. 20, 2017). Quota share is specific to regulatory areas and given effect through Individual Fishing Quota (IFQ) permits that NMFS issues

on an annual basis. 50 C.F.R. § 679.40. An IFQ permit authorizes the permit holder to harvest a specific amount of halibut or sablefish in a particular regulatory area for the applicable year. *See id*. IFQ permit holders with halibut IFQ for Southeast Alaska south of Cape Spencer Light are authorized to harvest halibut in Clarence and Chatham Straits, as well as in the Gulf of Alaska. Conversely, sablefish IFQ issued for Southeast Alaska may only be fished more than three miles offshore in the Gulf of Alaska. As discussed above, the State of Alaska manages sablefish fishing in Southeast Alaska's inside waters and limits participation to SSEI and NSEI permit holders. *Id*. § 679.2 (IFQ regulatory area, para. 2); 5 Alaska Admin. Code §§ 28.100, 28.105.

## B. Offense conduct

Daniels did not hold a permit for either the SSEI or NSEI fishery in 2020 and, as a result, could not lawfully harvest sablefish in either regulatory area. And Daniels knew that. For example, on October 22, 2020, Daniels texted the director of the Alaska Longline Fishermen's Association for guidance on whether, on a single fishing trip in the Gulf of Alaska, he could fish sablefish more than three miles off shore and thereafter fish halibut within three miles of shore. In the exchange that followed, Daniels clarified: "I don't have a Clarence permit," referring to a SSEI permit. At the same time, Daniels had sablefish IFQ, which allowed him to participate in the federal sablefish fishery off Southeast Alaska in the Gulf of Alaska. And he had halibut IFQ that he could fish in both the inside waters of Southeast Alaska and in the Gulf of Alaska.

Daniels was required to submit an IFQ landing report and ADF&G fish ticket for

each commercial landing he made. Additionally, on the fall 2020 fishing trips at issue in this case, Daniels was required to maintain a daily fishing logbook on his vessel and make it available to the NOAA Office of Law Enforcement upon request. *See* 50 C.F.R. § 679.5. These recordkeeping and reporting requirements are important tools to sustainable fisheries management in Alaska.

### 1.     *October 2020*

In late October 2020, Daniels captained the F/V *Pacific Bounty* on a fishing trip during which he illegally harvested sablefish in Clarence Strait. As Daniels texted Person C three days before the trip:

> I got a plan[.] I am going to go do what I can and then go to Clarence and do some so called halibut fishing at night[.] my buddy just called and said it's super good there and he is going to make a few sets in Chatham for me and meet me back down in Clarence and do the black bird flies a[t] midnight thing.

To keep this from regulators and authorities, Daniels falsely reported that the sablefish, halibut, and other fish he caught on the trip were harvested in the Gulf of Alaska, southwest of Cape Ommaney, Baranof Island. He also shut off his vessel monitoring system (VMS) on the second day of this trip in Clarence Strait. And he made false entries in the F/V *Pacific Bounty*'s daily fishing logbook as to the coordinates where he set and hauled four sets of gear. Daniels falsely reported the ADF&G statistical area on the IFQ landing report and ADF&G fish tickets when he landed his catch to match the F/V *Pacific Bounty*'s false logbook entries. But Daniels was never at or near the coordinates he recorded in the logbook: he fished more than 200 nautical miles away, in and near the southern end of



Clarence Strait. Daniels falsely reported the locations where he caught all the fish from this trip: 1,832 pounds of sablefish, 2,145 pounds of halibut, and other species. A commercial processor in Ketchikan paid Daniels a total of $12,891.10 for that catch.

2.  *November 2020*

Days later, on an early November 2020 fishing trip, Daniels again illegally harvested sablefish – this time, in Chatham Strait – and made numerous false statements to cover that up. Specifically, in the F/V *Pacific Bounty*'s logbook, Daniels falsely reported fishing for halibut in southern Chatham Strait and fishing for sablefish west of Chichagof Island in the Gulf of Alaska. In truth, Daniels did just the opposite: he illegally harvested sablefish (not halibut) in Chatham Strait and harvested halibut (not sablefish) in the Gulf of Alaska. As Daniels texted an associate on the first day of this fishing trip: "I am gonna fire out two [sets of gear] and go hide in cosmo cove [on Baranof Island] from the [U.S. Coast Guard] cutter Annacappa [*sic*]. And haul back after dark then be in the sound

tomorrow black bird flies at midnight." Daniels explained: "I am no[t] so much worried about getting my Halibut done but starting to stress about my [black] cod." The 2020 IFQ sablefish and halibut season ended in Alaska on November 15, 2020. IPHC Fishery Regulations § 9(3) (Sept. 2020). IFQ that is not fished in the applicable fishing year is forfeited unless the underage is 10 percent or less. 50 C.F.R. § 679.40(e).



Daniels made numerous false entries in the F/V *Pacific Bounty*'s logbook on this trip. He falsely documented that he retained halibut in Chatham Strait (when, in truth, he caught sablefish). He entered locations for the gear sets consistent with halibut fishing (locations with depths of approximately 1,170 to 1,500 feet) that the F/V *Pacific Bounty* never went to on the trip. GPS and VMS data showed he fished approximately 0.7 to 1.2 nautical miles east of the coordinates he entered in the logbooks, at locations consistent with sablefish fishing (depths of approximately 1,800 to 2,100 feet). Daniels also made false statements as to the ADF&G statistical areas where he caught his fish on the IFQ

landing report and ADF&G fish tickets. After being questioned about his fishing activities on this trip after a routine dockside inspection, Daniels provided a written statement to the NOAA Office of Law Enforcement in which he said he "made two halibut sets [i]n Chatham [S]trait." *See* **Exhibit 1**. In all, Daniels landed approximately 11,682 pounds of sablefish, approximately 1,119 pounds of halibut, and other catch from this trip. He sold the fish he landed to a commercial processor in Juneau for a total of $21,924.05.

### 3. *Relevant conduct*

While they do not affect the Guidelines calculation, Daniels committed other NOAA violations in 2019 and 2020. In October 2019, Daniels engaged in unlawful sablefish high-grading, meaning he discarded smaller sablefish so he could use his IFQ to land larger sablefish, which are worth significantly more per pound. 50 C.F.R. § 679.7(f)(11). Additionally, on a September 2020 fishing trip, Daniels deployed gear in an IFQ regulatory area when he had more halibut on board the F/V *Pacific Bounty* than he had available (unfished) halibut IFQ for that IFQ regulatory area. In doing so, Daniels violated 50 C.F.R. § 679.7(f)(4) and the Northern Pacific Halibut Act. 16 U.S.C. § 773e. He then transported his catch to Juneau where he sold it to a commercial processor, in violation of the Lacey Act. 16 U.S.C. §§ 3372(a)(1), 3373(d)(2).[5]

//

//

---

[5] For clarity's sake, the United States has no indication that Daniels made false statements in the F/V *Pacific Bounty*'s daily fishing logbook or on other reporting documents related to this September 2020 fishing trip. (*But cf.* Doc. 22 ¶ 9.)

U.S. v. Daniels
1:24-cr-00006-TMB-MMS

## GUIDELINES CALCULATION

## I.  **Offense Level**

Daniels' two offenses group under the Guidelines, such that Daniels' multiple counts do not increase the offense level. U.S.S.G. § 3D1.2(d). Because the guideline range for Daniels' Lacey Act offense is higher than that for his Endangered Species Act offense, the former controls. *Id*. § 3D1.3(a).

The base offense level for Daniels' Lacey Act offense is 6. Because Daniels' offense involved pecuniary gain, otherwise involved a commercial purpose, or a pattern of similar violations, a 2-level increase applies. As the parties agreed (Doc. 3 at 6), the market value of the fish involved in Daniels' Lacey Act offense was $127,528 and, as a result, an additional 8-level increase applies. Additionally, a 2-level upward adjustment applies for Daniels' use of a special skill. (Doc. 22 at 31-32.) The United States incorporates by reference the legal memorandum it submitted with its PSR objections. *See* **Exhibit 2**. Daniels' objection to this adjustment remains unresolved. Daniels has demonstrated his acceptance of responsibility and, as such, a 3-level reduction applies. In sum, Daniels' guideline calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. § 2Q2.1(a) | 6 |
| Specific Offense Characteristics | | |
| • Committed for pecuniary gain, otherwise involved a commercial purpose, or involved a pattern of similar violations | U.S.S.G. § 2Q2.1(b)(1) | +2 |
| • Market value of fish involved in offense | U.S.S.G. §§ 2Q2.1(b)(3)(A)(ii) & cmt., n.4; 2B1.1(b)(1)(E) | +8 |

| | | |
|---|---|---|
| Adjustment for special skill | U.S.S.G. § 3B1.3 | +2 |
| Adjustment for acceptance of responsibility | U.S.S.G. § 3E1.1(b) | -3 |
| **Total Offense Level:** | | **15** |

## II. Criminal History Category

Daniels' criminal history places him in Criminal History Category II.

## III. Guideline Range

With Offense Level 15 and Criminal History Category II, the resulting guideline range is 21-27 months. The applicable fine range is $7,500 to $75,000.

## STATUTORY CRITERIA AND RECOMMENDED SENTENCE

The United States respectfully requests the Court sentence Daniels to six months' incarceration, a $25,000 fine, and three years' supervised release with conditions of release terms that include a one-year commercial fishing ban, vessel monitoring, and 80 hours of community work service. (Doc. 3 at 12.) This sentence would serve each of the 18 U.S.C. § 3553(a) sentencing aims.

## 1. Nature and circumstances of the offenses

Two crimes are at issue here: Daniels' sperm whale take and the false statements he made on fishing records related to his illegal sablefish fishing. First, Daniels tried to kill at least one endangered sperm whale.[6] Daniels' behavior evidences a total disrespect for whales and the laws that protect them. Indeed, Daniels' actions and intent are a text book

---

[6] Daniels' text messages on March 25 and March 26, 2020, could be understood to document multiple interactions with a single whale or, instead, multiple whales. *See supra* at 4-5.

U.S. v. Daniels
1:24-cr-00006-TMB-MMS

example of why the Endangered Species Act is so vital. Daniels had his crewman shoot the whale and put "6 rounds in it." He tried to ram the whale with his 50-foot vessel and came within feet of doing so. He tightened his fishing line when he knew the whale was entangled in it. As Daniels texted Person C: "this f***er will say my name before I am done with him." And he did all of this without regard to the safety of his crew.

Whether Daniels killed the sperm is unclear. But there is no doubt that is exactly what Daniels tried to do and that he did, in fact, take the whale in violation of the Endangered Species Act. 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). Daniels was also unconcerned with the illegal nature of his conduct. On March 26, 2020, Person B warned Daniels, "Um yeah don't kill a whale. That's a federal offense." Daniels responded: "The feds are shut down and I don't care."[7]

That the take occurred while the whale was engaged in depredation does not mitigate the gravity of this crime. Daniels was understandably angry that the whale cost him gear and catch. But that is no excuse to shoot, pursue, further entangle, or try to kill a whale. And sperm whale depredation involving sablefish longline fishing is not a new problem: it has been documented for over two decades in the Gulf of Alaska.[8] As an experienced fisherman and vessel captain, surely Daniels was familiar with strategies that fishermen and scientists have developed to avoid sperm whales.[9] In any event, he easily

---

[7] Presumably, "the feds are shut down" was a reference to the workplace closures related to the COVID-19 pandemic in March 2020.

[8] *See, e.g.*, https://seaswap.info/.

[9] *See, e.g.*, https://seaswap.info/research/; https://www.alfafish.org/whaleavoidance#whales.

could have sought guidance on how to handle the situation lawfully from NOAA, the Alaska Longline Fishermen's Association (which he contacted with other fishing-related questions, *see supra* at 7), or other fishermen. Instead, Daniels chose to vent to associates over text and tried to kill the whale, endangering his crew in the process.

Second, Daniels violated the Lacey Act by making numerous false entries on multiple recordkeeping and reporting documents and then, as to IFQ reports and ADF&G fish tickets, submit them to the government. For example, to cover up his illegal sablefish fishing in Chatham Strait in November 2020, Daniels made the decision to falsify his logbook entries for each set of gear he deployed on that trip. He falsified the coordinates where he set gear, the species he caught at those coordinates, the depths he fished at, and the quantity of fish he retained. He made similar statements on his IFQ landing report and ADF&G fish ticket. When OLE initially questioned Daniels about his fishing activities on that trip, he lied and said he fished for halibut in Chatham Strait. *See* **Exhibit 1**. These false statements were material: as discussed above and in the next section, NOAA and the State of Alaska count on fishermen to honestly and accurately complete required recordkeeping and reporting documents to sustainably manage Alaska's fisheries.

The circumstances of Daniels' false statements – that is, the reason for his Lacey Act false labeling – further amplify the gravity of his crime. Daniels knew he could not fish for sablefish in Southeast Alaska's inside waters, but he did his "black bird flies at midnight thing" and fished there anyway. Therein, Daniels thieved sablefish that SSEI and NSEI permit holders were entitled to have the opportunity to catch, having invested

substantially in their limited entry permits. Fishing illegally for sablefish in the inside waters also gave Daniels an unfair competitive advantage over law-abiding IFQ sablefish permit holders. He saved time and avoided higher expenses and more challenging marine conditions that come with fishing sablefish IFQ in the Gulf of Alaska, farther from port. That was especially true given Daniels' offense conduct occurred at the end of the IFQ season when the weather deteriorates. In short, Daniels' Lacey Act offense was no momentary lack of judgment: it was a crime of deceit and greed.

## 2. History and characteristics of the defendant

Daniels is 55 years old and has fished commercially in Alaska for over 20 years. (Doc. 22 at ¶¶ 64, 69.) He owns the F/V *Pacific Bounty* and has an active business license for Pacific Bounty Fisheries. (*Id.* at ¶ 68.) Despite apparently dealing with health issues for years, Daniels has continued to fish. (*Id.* at ¶¶ 52, 64, 69.)

Daniels has five misdemeanor criminal convictions. (*Id.* ¶¶ 36-40.) Those convictions are for domestic violence (at age 43 and age 36), driving while intoxicated (at age 44 and age 21), and marijuana possession (at age 25).

## 3. Seriousness of the offenses and just punishment

Daniels' attempted killing of at least one sperm whale is patently serious. Sperm whales are listed as endangered, meaning they are in danger of extinction throughout all or a significant portion of their range. 16 U.S.C. § 1532(6). Because the need to protect endangered species is so great, the Endangered Species Act's definition of "take" is broad. *Id.* § 1532(19). Committing any one of the prohibited acts identified in that definition

U.S. v. Daniels
1:24-cr-00006-TMB-MMS

suffices to constitute a take. 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). Significantly, Daniels committed not just one, but many, of these acts in shooting, pursuing, and attempting to ram the whale with the F/V *Pacific Bounty*. Incarceration, in addition to a fine and supervised release, is necessary to justly reflect the gravity of Daniels' actions and the consequences they may have had for the sperm whale.

Likewise, Daniels' Lacey Act crime is sufficiently serious that jail time is required to provide just punishment. Falsifying recordkeeping and reporting documents has a direct effect on sustainable fishery management. *Seabeck*, 2017 WL 10845066, at *16. Fishery managers distribute the catch of regulated species "to maintain the health of those stocks or avoid localized depletion or overfishing." *Id*. And in undertaking stock assessments that inform those decisions, NMFS uses information that commercial fishermen provide on recordkeeping and reporting documents, including IFQ landing reports, ADF&G fish tickets, and vessel logbooks. *Id.*, at *19. NMFS uses the information fishers provide on IFQ landing reports and ADF&G fish tickets to debit permit holders' accounts to ensure that the species are not overfished and an equal playing field is maintained for all IFQ permit holders. *See id.*; *see also id.* § 679.40. The State of Alaska similarly relies on the accuracy of the information that fishermen report to sustainably manage its fisheries, including the SSEI and NSEI sablefish fisheries.[10] As

---

[10] *See, e.g.*, https://newsrelease.adfg.alaska.gov/index.cfm?adfg=wildlifenews.view_article&articles_id=811 (management of Alaska's fisheries depends on knowing "how many of what species are caught, when, and where").

U.S. v. Daniels
1:24-cr-00006-TMB-MMS

an experienced commercial fisher, Daniels must have understood all of this and the impacts his illicit activities could have on the resource.

### 4. Adequate deterrence

General deterrence has special importance in difficult-to-detect wildlife cases like this one. These crimes are typically committed in remote locations, with no witnesses or none willing to come forward. We also know that whale depredation continues to affect commercial longline fisheries in the North Pacific Ocean.[11] Daniels' Endangered Species Act offense is the first sperm whale take criminally prosecuted in Alaska and may well be the first in the nation. This case has received significant public attention. Collectively, these factors make incarceration necessary to adequately deter others by clearly signaling that there are serious consequences for taking an endangered species.

The same holds true for Daniels' Lacey Act false labeling offense. As discussed above, recordkeeping and reporting fishing documents are critically important to sustainable fishery management. To deter conduct like Daniels' in the future, those tempted to lie on recordkeeping and reporting documents and fish illegally must know they will face jail time if they do. The sentence imposed must also ensure that Lacey Act prosecutions are not seen as merely a cost of doing business (*i.e.*, ensure the economic benefit of unlawful activity does not exceed the consequences of breaking the law). The United States' recommended sentence will afford adequate general deterrence for crimes like Daniels' and, as result, will help safeguard marine mammal and fishery resources.

---

[11] *See, e.g.*, https://seaswap.info/research/; https://www.alfafish.org/whaleavoidance#whales.
U.S. v. Daniels
1:24-cr-00006-TMB-MMS

Specific deterrence also matters here. As discussed, Daniels' crimes were brazen. His text messages documenting his sperm whale take show his disrespect for whales and the law. Daniels' false statements underlying his Lacey Act offense show the steps he is willing to take to try and cover up his illegal activities. The sentence imposed must be one that deters Daniels from committing similar crimes when he is back out on the water. A sentence of six months incarceration, coupled with the one-year commercial fishing ban, vessel monitoring, and 80 hours of community work service the parties agreed to in the plea agreement, will be sufficient but not greater than necessary to address general and specific deterrence in this case.

## 5. Protection of the public from further crimes of the defendant

Public safety is not a central concern in this case, but safeguarding Alaska's marine resources is. The need to keep Daniels from committing further wildlife crimes is discussed above. Beyond that, the United States' recommended sentence – particularly a six-month term of incarceration, a one-year fishing ban, and vessel monitoring – will help ensure Daniels does not commit marine resource crimes in the future.

## 6. Avoidance of unwarranted disparities

According to the United States Sentencing Commission, more than half of the defendants sentenced since 2015 who were similarly situated to Daniels received probation.[12] For the 44 percent of those defendants who received prison time, the average

---

[12] Interactive Data Analyzer, United States Sentencing Commission, https://ida.ussc.gov/analytics/saw.dll?Dashboard (data filters applied: fiscal year(s) – 2015-2023; guideline – § 2Q2.1; sentencing zone – D; criminal history category – II) (last visited Oct. 22, 2024).

U.S. v. Daniels
1:24-cr-00006-TMB-MMS

sentence length was 11 months and the median length was 6 months. Notably, however, these figures reflect only the nine similar cases that were reported to the Sentencing Commission.

Reviewing prior wildlife cases in the District of Alaska is more helpful. Taken together, they demonstrate that imposing a below-Guidelines sentence of six months' incarceration in this case would avoid unwarranted sentencing disparities, while meeting 18 U.S.C. § 3553(a)'s other sentencing aims, especially given the gravity of Daniels' offenses.

As to Daniels' Endangered Species Act crime, several District of Alaska wildlife case are particularly instructive. *See, e.g.*, *United States v. Gil*, No. 3:22-cr-00006-JMK-KFR (D. Alaska May 18, 2022) (2 months' probation for killing one harbor seal in violation of the Marine Mammal Protection Act (MMPA)); *United States v. Gordon*, No. 4:19-cr-00009-RRB (D. Alaska 2020) (3 months' imprisonment for killing a polar bear and leaving the harvestable remains to waste in violation of the MMPA, where defendant was prohibited from possessing firearms and fell in Criminal History Category III due to multiple prior domestic violence assault convictions); *United States v. Nichols*, 3:18-cr-00050-SLG (D. Alaska Nov. 15, 2018) (5 years' probation for killing endangered Steller sea lions in violation of the MMPA and obstructing an MMPA investigation); *see also, e.g.*, *United States v. David J. Engelman*, 3:21-cr-00089-TMB-MMS (D. Alaska 2022) (7 days' imprisonment, 12 months' probation, and $3,000 fine for leaving the viewing platform at Brooks Falls, Katmai National Park, when grizzly bears were present and

feeding; video of the crime was broadcast globally).

Prior Lacey Act prosecutions in the District of Alaska also make clear the United States' recommended sentence would also avoid unwarranted disparities. *See, e.g.*, *United States v. Stevens*, 3:20-cr-00077-JMK (D. Alaska 2021) (6 months' incarceration, 126 days at a residential reentry center, and a $1 million fine for Lacey Act false labeling offense involving IFQ sablefish and halibut with a market value of $13.5 million); *United States v. Fuglvog*, 3:11-cr-00067-HRH (D. Alaska 2012) (5 months' incarceration and $50,000 fine for offense that involving IFQ sablefish worth over $100,000); *see also, e.g.*, *United States v. Kyle Potter*, 3:24-cr-00047-TMB (D. Alaska 2024) (5 years' probation, $20,000 fine, and 5-year commercial fishing ban for Lacey Act trafficking offense involving failing to land diseased crab in Alaska before transport to Washington State); *United States v. Lackner*, No. 3:17-cr-00087-TMB (D. Alaska 2019) (5 years' probation for 6 months' home incarceration for conspiring to falsify hunting records and other hunting offenses committed in Wrangell-St. Elias National Park and Preserve).

## 7. Sentencing recommendation

The United States respectfully requests the Court sentence Daniels to a total term of incarceration of six months, a $25,000 fine, and to serve three years' supervised release, with several special terms of supervised release: a one-year commercial fishing ban, vessel monitoring, and 80 hours of community work service. (Doc. 3 at 12.) This sentence is sufficient but not greater than necessary to meet 18 U.S.C. § 3553(a)'s sentencing aims.

//

U.S. v. Daniels
1:24-cr-00006-TMB-MMS

**CONCLUSION**

The United States respectfully asks this Court to adopt the United States' sentencing recommendation, which is consistent with Daniels' plea agreement and the arguments and authorities set forth in this memorandum.

RESPECTFULLY SUBMITTED November 5, 2024 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

/s Andrea W. Hattan
ANDREA W. HATTAN
Special Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2024 a true and correct copy of the foregoing was served electronically on all counsel of record.

/s Andrea W. Hattan